THE STATE v. RAYMOND RIDDLE, Appellant.—23 S. W. (2d) 179.

Division Two, December 11, 1929.

*Cope & Tedrick* for appellant.

98

*Stratton Shartel,* Attorney-General, and *Don Purteet,* Assistant Attorney-General, for respondent.

DAVIS, C.—In an information filed in the Circuit Court of Butler County by the prosecuting attorney, defendant was charged with robbery in the first degree. The jury returned a verdict finding him guilty as charged in the information, and assessed his punishment

at imprisonment in the State penitentiary for a period of five years. Defendant appealed.

The evidence submitted on the part of the State warrants the finding that, on July 1, 1928, one J. M. Anderson, between sixty-eight and seventy years of age, operated a store in the town of Qulin, Butler county. He also occupied the store building as sleeping quarters. Between eleven-thirty P. M., and midnight on July 1, 1928, Anderson was in his store conversing with one Lincoln Waller. While they were thus conversing, a man, in overalls, entered the store with a pistol in his hands and commanded, "Throw up your hands or I will shoot you." Anderson grappled with the man, and, scuffling, they fell behind the counter. While scuffling, Anderson said that he felt that the man's overalls were wet from the knee down. The man spoke frequently during the consummation of the robbery. Defendant was twenty years of age and had lived in Qulin for about ten years. Anderson said that he had known him for seven or eight years. He had seen defendant that day on the street. Anderson said to the best of his knowledge he recognized the voice, and it was defendant's voice to the best of his knowledge. The record shows:

"Q. You say that the voice of the man that robbed you was Raymond Riddle's? A. Yes, sir.

"Q. When he put the gun on you, what did he say? A. He said, 'Throw up your hands or I will shoot you.'

"Q. Did you recognize that voice that minute? A. To the best of my knowledge, I did."

The man hit Anderson over the head with the pistol, and then covered him with the pistol and made him open the safe. The man robbed Anderson of $221. He made Anderson turn out the lights. He conducted Anderson into the back room, and, after obtaining wire, wired his hands and fled *via* the back door. Subsequently, Anderson loosened the wire and went to the home of one Hoyle and told him of the robbery. He did not remember telling Hoyle that he did not know who the robber was. He did not know whether or not he told Hoyle that night that he recognized the voice of the man. The next morning he talked with the justice of the peace, who issued an information charging defendant and Waller with the robbery. He told the justice that he did not right then know the robber. The first time that Anderson ever said that he recognized the voice of the robber was at the preliminary trial. The record shows:

"Q. Did you make a statement there that morning in the presence of the man just mentioned that you could not tell who it was that robbed you, that it was a man about the size of Fred Piatt, and that he had on dark clothes, but that you could not recognize him? A. I could not tell who it was, because I could not see his face.

"Q. Are you swearing to this jury that this boy here is the same boy you described to the officers? A. His voice was familiar to me, and to the best of my knowledge it was his voice.

"Q. Tell the words he said that made you think it was his voice. A. When he said, 'Throw up your hands,' it seemed like I recognized his voice."

Anderson said, "I told you to the best of my knowledge it was his voice. That is all I can say." Anderson repeatedly said during his examination that he did not see his face, but that to the best of his knowledge it was defendant's voice. Anderson said that the robber hammered him on the arm with the pistol and put the arm out of commission.

Harley Pace, witness for the State, who lived across the street from the store, testified that, just before the lights went out, on the night of the robbery, he saw a man on the store porch, who looked across at him twice, then opened the door and went in, and after the lights went out, a flash light was flashed at each window. The man he saw did not look at all like defendant. Pace had been in bed and was aroused, and after he noticed the man, he returned to bed. The man Pace saw was fleshier than defendant and a few inches shorter.

William Knee, witness for the State, testified that he ran a filling station at Qulin. He knew defendant. On the evening of the night that Anderson was robbed, about eight P. M., defendant and Lincoln Waller were at the filling station to get gasoline. While one of them was sitting in the car and the other standing with his foot on the fender, with witness inside the filling station about twelve feet from them, he heard one say to the other, "You are not going to back out, are you?" and the other replied, "Hell, No!" Defendant was dressed in blue overalls. About two weeks before the trial, defendant told witness he would kill him if he testified. The evidence developed that witness testified as above related at the preliminary hearing, but that about two weeks before the trial hard feelings arose between defendant and the witness over the repair of an automobile of the witness by defendant, and it was after that that defendant said he would kill him if he testified.

Howard Vandover testified, for the State, that the day following the robbery, defendant approached witness's home, and he said to defendant, "Loan me some money," and defendant just laughed. Witness's sister then asked defendant "what he wanted to knock the old man in the head for," and defendant replied, "He ought to have stuck up his hands." Witness stated that all of them were joking and that he thought nothing about it.

Herschel Stroud, for the State, testified that, on the night of the robbery, defendant drove four boys to a dance, two miles or more from Qulin, and charged them a quarter each. On the way to the

dance, the water across the road drowned the engine of the car and they were pulled out. Defendant waded into the water and it came a little over his shoe tops. He was to return to the dance for the boys, but he failed to appear. There was a large amount of water around Qulin at that time.

Witness Hoyle testified for the State that Anderson came to his house and apprised him of the robbery. About an hour after the robbery he went to defendant's home where he found him in bed and woke him up. Later, the deputy returned with a search warrant and searched his home. He did not find any money or a gun.

Deputy Sheriff Piatt, for the State, testified that he aided in executing the search warrant, and that he examined that night defendant's overalls and shoes; they were wet and they looked like he had been wading in water with them. On cross-examination, witness said that he heard Anderson make, while before the justice of the peace the next morning, a statement to the effect that he did not know who it was that robbed him.

The testimony of defendant tended to establish an alibi. His mother stated that he came home near eleven o'clock that night and went to bed. She later heard a racket at Anderson's store, but defendant was in bed.

The justice of the peace testified that, when Anderson appeared before him on the morning following the robbery, Anderson told him that he was unable to identify the fellow that robbed him. Defendant, Piatt and Irvin Waller were there at that time. Anderson said to him that the voice was familiar, but that he could not apply that voice to any particular person.

Irvin Waller, bank cashier, stated that he heard Anderson state at the justice's office the next morning that he was unable to identify the man.

Lincoln Waller, informed against with defendant, testified that he was in the store when the robber came in, that when the lights were turned out he slipped out the back door, but that the robber was not defendant. The robber was heavier and wore a dark suit of clothes and dark mask. He heard Anderson say at the justice's office the next morning that he did not know who robbed him.

Defendant's father testified that defendant came home about eleven P. M., that night and was in bed after that. He heard Anderson say at the office of the justice the morning after the robbery that he could not tell who it was.

Defendant testified and told about taking the boys to the dance and drowning the engine in the water, as well as being pulled out. On returning home he said the engine again drowned and he again waded into the water to fix it. He came home and went to bed. He denied being at Anderson's store after supper that night or taking

the money from him or knowing anything about the robbery until the next morning. They took him before the justice and he heard Anderson say there that he did not know who robbed him. Defendant judged he returned home that night between ten and eleven o'clock.

The State offered evidence in rebuttal. The justice of the peace, after being qualified, said the reputation of defendant for truth and veracity was bad. On cross-examination, he said the prosecuting attorney said recently that defendant's reputation was bad. On being pressed he could name no· other person, although he said others had said so.

Witness Huey testified, on being qualified, that defendant's reputation for truth and veracity was bad. Witness then said he did not think he would tell a lie, but that defendant would fight when he was drunk.

Witness Johns said his reputation for truth and veracity was bad, but he said on cross-examination, ''Well, I don't know about his truthfulness. As far as his telling the truth is concerned, I don't know about that.'' Witness then said that defendant had once told him a lie.

I. Defendant seemingly does not contend that the evidence fails to show the corpus delicti, that is, the perpetration of the crime of robbery, but, even if he did, the contention would be of no avail, for the evidence as to the corpus delicti tends to establish it. Defendant's challenge is that the probative evidence in the record fails to connect clearly defendant with the robbery as alleged.

Knowledge of a fact is communicated to a person through one or more of the five senses, which are hearing, seeing, feeling, smelling and tasting. In some persons, a sense is more acute or developed more than in others. However, courts cannot undertake to say as a matter of law that testimony of a witness, based on one of his senses, has no probative value. In its consideration of the facts and circumstances, the jury may conclude that it is without probative value, but that is so because the jury is the trier of the facts. Defendant does not seem to deny that it would have been direct evidence of that fact, if Anderson had testified that he identified defendant as the robber by means of sight. It is none the less direct evidence that he identified defendant by his voice. The force of the identification of defendant by means of his voice was a question of fact and within the province of the jury, and, as the facts made a submissible case, the weight of this testimony was for the jury. The identification of defendant did ·not depend wholly upon circumstantial evidence, as defendant contends, for the identification of a person by means of

his voice is direct evidence of identification, as much so as though the identification had been through sight. [State v. Bell, 300 S. W. 504.]

There is no doubt but that the record establishes that Anderson identified defendant as the perpetrator of the robbery. His testimony, relative to identification, was somewhat weakened by the reiterated statement, "to the best of my knowledge," as well as by other facts developed, but an analyzation of the testimony shows that he meant and testified that defendant was the person who robbed him that night. The statement "to the best of my knowledge" meant that it was possible that he was mistaken, but that his knowledge, as well as his belief, based on his knowledge, was that defendant had robbed him. In effect, Anderson testified that he was familiar with defendant's voice, that the voice was familiar that night, but that the first time he recognized the voice of defendant as that of the robber was at the preliminary hearing the next day. This testimony was equivalent to saying, to my knowledge, or as Anderson said, "to the best of my knowledge it was defendant's voice." While his testimony was somewhat weakened by his own testimony that he said the next morning he could not tell who it was, because he could not see his face, and by the testimony of Pace for the State that the man he saw on the porch just before the lights went out did not look at all like defendant, nevertheless the evidence for the State as a whole substantially connected defendant with the robbery, thus rendering the cause submissible to the jury. It follows that the determination of a controverted fact is without our province, and we must submit to the finding of the jury. The demurrers to the evidence were properly overruled.

II. The information is said to be defective, because it omitted to conclude, in accordance with the mandate of Section 38, Article VI, of the Missouri Constitution, "against the peace and dignity of the State." The record develops that the information failed to so conclude, but that, after the jury had been selected and sworn, and after the defendant had filed a motion to quash it on the ground that it failed to charge him with any crime under the law, which motion to quash the court overruled, the court permitted the State to amend the information by adding thereto the words omitted. Consequently, the real question in issue does not involve the defectiveness of the information, except incidentally, but involves the action of the trial court in permitting the information to be amended on the trial, after the swearing of the jury.

The amendment of an information is permitted by the statutes.

104

The amendment, however, on the trial, is subject to the proper determination of whether the amendment is a matter of substance or form. If the requested amendment involves a matter of substance, the information cannot be amended on the trial. If it is a matter of form, the amendment is properly allowed. We recite the statutes, or such portions thereof, as are necessary. The concluding portion of Section 3853, Revised Statutes 1919, reads:

"And any affidavit or information may be amended in matter of form or substance at any time by leave of court before the trial, and on the trial as to all matters of form and variance, at the discretion of the court, when the same can be done without prejudice to the substantial rights of the defendant, on the merits, and no amendment shall cause any delay of the trial, except at the instance of the defendant for good cause shown by affidavit."

A portion of Section 3908a, page 195, Laws 1925, reads:

"An information may be amended either as to form or substance at any time before the jury is sworn, but no such amendment shall be allowed as would operate to charge an offense different from that charged or attempted to be charged in the original information."

Section 3908a, permitting amendments before the trial, is in harmony with Section 3853. To this extent one may be said to be declaratory of the other, thus permitting both to stand. However, Section 3853 advises that an information may not be amended as to a matter of substance on the trial. The court permitted, on the trial, an amendment of the information by adding the words, "against the peace and dignity of the State." The question follows: Did this amendment involve a matter of form or a matter of substance?

We think there is no doubt but that the phrase, "against the peace and dignity of the State," is an essential averment in an indictment or information. [Sec. 38, Art. VI, Missouri Constitution; State v. Ulrich, 96 Mo. App. 689, 70 S. W. 933.] Essential averments, however, may be either matters of form or substance. The phrase is not of itself a statement of facts, but is a mere conclusion, dependent upon the facts in the indictment or information charging the crime. It is the facts charged in the indictment or information—not the conclusion—that determine and establish that the act with which defendant stands charged is against the peace and dignity of the State. The omission of the phrase, so far as the facts charged are concerned, would not take from defendant any right, nor impair nor confuse him in his defense. Moreover, such amendment would not tend to alter the meaning of the charge or give the State an advantage, for the facts and circumstances introduced with respect to the alleged crime would develop whether or not the act was against the peace and dignity of the State. From what we have said, it follows that the phrase, "against the peace and dignity of the State," while an es-

sential averment, is a mere matter of form, resulting that an information may be amended by adding the words on the trial and after the jury is sworn. While State v. Adkins, 284 Mo. 680, 225 S. W. 981, is not precisely in point, we think the reasoning found in the concurring opinion of WILLIAMSON, J., supports our conclusions. In permitting the amendment, the trial court did not err.

III. It is said that the information is defective, because it did not allege in the body thereof that the crime was committed in Butler county, Missouri. The margin of the information shows the venue to be Butler County, Missouri, and consequently, it was unnecessary to aver the venue in the body of the information. [Secs. 3900, 3908, R. S. 1919.] The question has many times been ruled against the contention of defendant, and we need not discuss it. [State v. McDonough, 232 Mo. 219, 134 S. W. 545, and collation of cases cited under Secs. 3900, 3908.]

IV. Defendant finally complains as follows: ''Instruction numbered 1 is erroneous for the reason it is not based on the information. The information does not allege that the crime was committed in the County of Butler and State of Missouri, but the instruction requires the jury to so find before defendant can be convicted.''

It is evident, from a reading of the preceding paragraph of this opinion, that the complaint is not well taken. As we have many times held, the venue stated in the margin is equivalent, under the Statute, to an averment of venue in the body of the information. The instruction was based on the information, thus rendering the complaint untenable.

V. An examination of the remainder of the record proper shows it to be free from error.

The judgment is affirmed. *Henwood* and *Cooley, CC.*, concur.

PER CURIAM:—The foregoing opinion by DAVIS, C., is adopted as the opinion of the court. All of the judges concur, except *Walker, J.*, absent.