THE STATE v. TOM SCOBEE and RAYMOND MANNING, Appellants.—53 S. W. (2d) 245.

Division Two, September 28, 1932.

*F. E. Robinson* and *Murrell & Murrell* for appellants.

*Stratton Shartel,* Attorney-General, and *Denton Dunn,* Assistant Attorney-General, for respondent.

ELLISON, J.—The defendants appeal from a conviction of robbery in the Circuit Court of Knox County. The punishment of both was fixed by the jury at ten years' imprisonment in the penitentiary. Their defense was an alibi supported by strong evidence, particularly as to the defendant Manning. The principal assignment of error urged here is that the verdict was so much against the weight of the evidence as to indicate passion and prejudice. Complaint is made also of certain instructions.

The prosecuting witness was William Eyler, a man operating a taxicab at Baring in Knox County. He said that about midnight of December 31, 1929, the appellant Scobee was brought to his hotel room in Baring by one of the hotel employees. There was a light in the hall and he turned on the light in his room, so he got a good look at Scobee. The latter engaged the taxicab to take him and his companion, the appellant Manning, to Edina, the county seat. Eyler dressed and followed Scobee downstairs to the restaurant where they were joined by Manning. Scobee got into the taxi first, in the back seat; Manning sat in front.

As they were driving out of Baring one of the two defendants said something about their having got off the train, referring to an eastbound Santa Fe passenger train which passed through Baring shortly after eleven P. M. Eyler inquired if anybody else had come in on the train. Scobee or Manning answered there was one other fellow; and about that time according to the testimony of the witness, Manning stuck a gun in his face. Eyler offered resistance and seized the gun and they told him they would blow his head off. They compelled him to stop the automobile and get out. While Manning kept him covered with the revolver Scobee searched him and tied his hands and stuffed a handkerchief in his mouth. Finding only $4 on his person, one of the defendants said to him "you — — we ought to kill you! Only you have got this money—you have either left it at home or done something with it." Eyler told them he would not be carrying much money at that time of night.

After they had tied Eyler's hands and gagged him the two defendants got back in the car and compelled Eyler to get in with them. Manning took the wheel and Eyler sat beside him. They drove about half way to Edina and turned off on a side road, driving down about a quarter of a mile where they stopped the car and compelled Eyler to get out again. They took him into a field some 250 yards and produced from a valise an old blanket which they spread upon the ground, and required Eyler to lie down on it. Then they tied his feet together, tied his feet back to his hands and put another handkerchief in his mouth. They also took off his shoes and left him lying on the ground, departing in his automobile, which was a 1929 model Ford. They left the grip, the rope and blanket and an old coat. These were recovered by the officers of Knox County later.

Eyler remained lying helpless in the field for some two and a half hours In the meantime he had succeeded in getting the gag out of his mouth and attracted the attention of a man named Lincolnfeller about 2:30 in the morning, who released him.

He next saw the defendants five days after the robbery at the police station in Fort Madison, Iowa. By some means or other he had been informed the men who had robbed him might be found there. He drove up to Fort Madison, which is about 100 miles from Baring, with the sheriff of Knox County and a young man named Harry Simpson. The Fort Madison police brought the defendants Scobee and Manning into the police station. Eyler says he recognized the appellant Scobee at once as the man who had come to his hotel room and engaged the taxi. He admitted he did not get a good look at Manning's face at the time of the robbery because his hat was pulled down, but identified him by his "make-up" and voice. On the witness stand Eyler pointed to the appellant Scobee as he sat in the courtroom and positively

identified him as one of the robbers and he furthermore declared he was positive Manning was the man who had the revolver in the automobile that night." The young man Simpson on this occasion and in Eyler's presence identified Scobee and Manning as two strangers he had seen in Callahan's barber shop at Baring on the afternoon preceding the robbery.

On cross-examination Eyler was asked to describe the dress of the robbers. He said Scobee had on overalls and a jumper and dark cap. When he talked to him in the hotel they were standing within four feet of each other. Manning, he said, was wearing a dark coat and hat and according to his best recollection a dark pair of trousers. The witness' Ford automobile was recovered in Kansas City on January 7.

Orville Marget, a garage keeper in Edina, said he was requested by telephone to come to his garage on January 1 about 1:30 A. M., where he sold some gasoline to two men in a Ford car. This was about an hour and a half after the robbery. He identified the defendant Scobee as the man who bought the gasoline. Scobee was waiting at the garage when the witness drove up. There was a light inside and Scobee went into the office to pay for the gas The witness said there was another man with Scobee at the time but he didn't see his face. The other man was a little shorter than Scobee. The witness said the car driven by the two men was a Ford with the right hind fender bent. He further stated he had recently seen the car of the prosecuting witness Eyler and that it was the same car the two men had that night. On cross-examination it was shown the witness in his testimony at the preliminary hearing had said he did not pay much attention to the kind of clothing worn by the two men, and in general that his identification of them was more or less indefinite.

W. F. Burns was a deputy sheriff of Knox County and night watchman in the town of Edina. He declared he saw both defendants in Edina late the night of Tuesday, December 31, 1929, when the robbery occurred. He was standing on the street corner near the bank when they came up. Scobee went to Zugg's restaurant to do some telephoning while Manning waited on the corner. Presently Scobee returned and reported Marget, the garage keeper, had consented to come up town and let him have some gasoline. Both defendants went to the garage and the witness followed and was present when Marget sold them the gasoline. He noticed their Ford automobile. There was a dent in the right hand fender and the chains were strung across the back. He declared it to be the same automobile exhibited to him as William Eyler's, at the time of the trial. The witness further said he talked to Manning a little and recognized him at the time as a person he had seen before, and then stated that

Manning had worked in the country near Edina for about a month some nine or ten years before, and came to town about every night. The witness was cross-examined at some length with regard to the kind of clothes the two defendants were wearing and as to what he had said on that point when testifying at the preliminary hearing.

Elmer Zugg, the restaurant man recalled the incident of a man's coming into his place between one and two o'clock in the morning on about December 31 and getting him to telephone Mr. Marget for some gasoline. He saw the defendant Scobee about a week later when he was arrested and brought to Edina, and testified that in his best judgment Scobee was the man. On cross-examination he said it was possible for him to be mistaken though he did not think he was. The man he saw the night of December 31 was wearing a bluish gray jacket reaching just below the knees, and had on a black cap. The defendant Scobee, when he saw him a week later, had on different clothes. All the evidence showed that Scobee was a larger man than Manning, and that Manning was "sandy-haired" and familiarly called "Red." The defendants produced a witness, Mark Francis, of Edina who said he was at Zugg's cafe between one and two o'clock the night of December 31, 1929, when a party came in and telephoned Mr. Marget for gas. He said the man had on overalls, a jacket and slouch hat, pearl gray in color with a black band. He couldn't say whether Scobee was the man on account of his dress. He was about the same size but the witness' impression was that it was not Scobee.

Harry Simpson testified he saw both defendants in the barber shop in Baring during the noon hour of December 31. The defendant Manning remarked that the town looked like it did eight years before. The barber, Mr. Callahan, asked the defendants where they were from and they said Fort Madison; that they had come from there "on the drag," (a freight train) and were seeking work on the pipe line. Manning inquired if Bill Eyler still ran a taxi. The witness was able to fix the date of the incident as being December 31 because he had just come back from a visit to his sister's the evening before, Monday, December 30. Mr. Callahan testified to about the same facts, though he said only that the two strangers who came into his shop "looked a whole lot like" the defendants. However he was certain the date was the day before New Year's because he missed dinner and when he got home his wife asked if he was going to do the same thing the next day.

The witness Simpson, as has been stated, was one of the men who accompanied Eyler to Fort Madison when the defendants were apprehended five days later on January 5. On cross-examination he declared he recognized Scobee as soon as the latter was brought before him in the police station. Scobee, he said, admitted being in the

barber shop at Baring and seeing him there on the preceding Tuesday (December 31) ; and also seeing Eyler on the same trip. The defendant Manning said he had been in Baring either the Monday, Tuesday or Wednesday before, and that it might have been Tuesday.

Officer Patterson said he was a night policeman in Fort Madison, and was at the police station when Scobee and Manning were brought in to be viewed by Eyler and Simpson. His testimony was that Scobee there admitted having seen Eyler once, and Eyler declared Scobee "was the man." Manning, when brought in separately later, said he had been in Baring the Monday before but that it might have been Tuesday. Both Scobee and Manning stated they went to Baring on a freight train to get work on the pipe line.

Clem Kreigshauser testified he was operating a restaurant at Baring the latter part of December, 1929 ; that on Tuesday, December 31, 1929, the defendant Raymond Manning and another man ate lunch in the restaurant about one o'clock in the afternoon. The witness said he wouldn't attempt to identify the other defendant but that he could identify Manning because he had known him some six or seven years before when Manning used to be around Edina. Manning recalled the fact to his attention, Kreigshauser having been then employed in a store at Edina. Manning talked about having worked for a certain man named Deviny back at that time and about having traded horses with someone else. This witness was not asked on cross-examination whether he was certain about the date, or how he˙ fixed it.

The foregoing is a summary of the evidence for the State. For the defense some forty-one witnesses testified in addition to the two defendants. The latter were brothers-in-law. Scobee's wife was Manning's sister. Another sister of Manning married Leroy Bryant, and Manning lived with them. Several members of the Bryant family testified for the defense as will be later narrated.

Both defendants resided in Fort Madison and were out of work. Their version of their movements just preceding and following the robbery of Eyler was as follows. A few days before, Scobee had learned there was a possibility of obtaining employment on a pipe line in northeast Missouri at Gorin. Early Monday morning, December 30, he met Manning in Fort Madison and proposed they investigate. They boarded an extra westbound Santa Fe freight train about nine A. M. intending to ride to Gorin but the train did not stop there so they continued on to Baring, at which station the train arrived about eleven A. M.

On the streets of Baring Manning says they met a pipe line employee named Peterson and asked about work. Scobee did not mention this incident in his testimony, but Peterson was a witness

and corroborated Manning fixing the date as December 30. Both defendants testified they saw a truck owned by the pipe line company drive up in front of the Callahan barber shop. The driver went in. They followed him inside where a conversation ensued between them and the barber, Callahan, the State's witness Simpson, and the oil man. While the defendants' testimony did not agree with the evidence for the State in all its details as to this conversation, the defendants admitted the incident occurred, and the essential point of difference is that the defendants fixed the date as being Monday, December 30, whereas the State's two witnesses said it was on Tuesday, December 31, about twelve hours before the robbery.

Being told by the oil man there was no prospect of their getting work through him they went to Kreigshauser's restaurant and ate lunch. Here again the defendant's story was in substantial accord with the testimony of Mr. Kreigshauser, witness for the State, in its main facts, except that they insisted the date was December 30 and not December 31.

Leaving the Kreigshauser restaurant they went across the street and sat on a bench in front of Collin's restaurant until about 1:30 P. M., when a local passenger train No. 16 was due, going east in the direction of Gorin and Fort Madison. During this interval they met an acquaintance named Ray Norton and visited with him. Manning saw the prosecuting witness Eyler and asked Norton who he was. Norton told him and rode as far as Rutledge on the train with them. All this was corroborated by Norton, who testified as a witness for the defense. He was positive the incident occurred on Monday, December 30, and not on Tuesday, December 31. He said he had gone to Baring the evening before, Sunday.

The defendants testified they got off the train at Gorin and remained there nearly two hours, going to the pipe line pumping station to see the foreman about getting a job. The foreman's name was Cliff Darr. His whereabouts were unknown to them at the time of the trial. Scobee testified that while in Gorin they also saw three other men, Carl McDonald, Homer Carter and Boss Deitrick. Manning mentioned only McDonald and another man named Lester Gilmer. Both these were witnesses for the defense, and said they saw the defendants in Gorin on December 30. McDonald fixed the date by a check he had given. Gilmer said it was his first day under the foreman at Gorin. So here again the question is whether the defendants were in Gorin on December 31 or the day before that.

The defendants say they left Gorin on a local freight train and got back to Fort Madison about seven o'clock that evening. The witness Gilmer said he saw them leave Gorin on that train. All the riding they did on the several trains mentioned, throughout the day,

was without the payment of fare. Both of them had worked for the railroad company and were acquainted with the train crews. Arriving in Fort Madison both defendants went to the home of Scobee and ate supper. From there on their movements diverged.

Manning testified that after eating supper with the Scobees he went to the home of his brother-in-law and sister, Mr. and Mrs. Leroy Bryant, where he lived, and remained that night. Early the next morning (December 31) he went back to Scobee's house and spent the time with him until noon. He returned to his own home for the noon meal, and was down town during the afternoon. About 7:30 that evening he purchased some cigarettes at a United Cigar Store and pool hall and had them charged to his account.

That evening he went to a New Year's eve party and dance at the home of Mr. and Mrs. George Miller in Fort Madison. The next day, January 1, he slept late and was at home. That night he went to a dance at Dodge's Hall and mentioned several persons he saw there. The next day, Thursday, January 2, he was at home in the morning, up town in the afternoon and at an Eagles' dance that night. He couldn't remember anyone he saw there. He was at home Friday, January 3, and up town all day and during the evening of Saturday, January 4. Early in the morning of Sunday, January 5 he was taken to the police station by Fort Madison officers and thence brought to Missouri. Apparently he was confined in jail at Kirksville until the trial of the case.

Retracing Manning's movements as detailed above, with a view to the corroborating evidence. Scobee's wife—Manning's sister—recalled that both defendants arrived in Fort Madison on a freight train the evening of December 30, and that she prepared supper for them. LeRoy Bryant, Manning's brother-in-law said he went to the Miller dance on New Year's eve with Manning, but he was not asked and did not testify to Manning's being in his home the night of December 30, and thence on through the remainder of the week. Mrs. Leroy Bryant, Manning's other sister, did not appear as a witness. Martin Delaney said he spent the whole afternoon of December 31 with Manning in Fort Madison and that he saw the defendant Scobee about four o'clock. Fred Gehrke testified he was a clerk in the United Cigar Store and sold a package of cigarettes to Manning on credit, as the latter had stated, in the evening of that day. He produced a page of an account book which he said recorded the transaction. John Caffer, a policeman, said he saw Manning in Fort Madison about eight o'clock and again about eleven o'clock the evening of December 31, on the latter occasion at the Miller dance; and also on the night of January 1 at the dance in Dodge's Hall.

Twenty witnesses who were relatives, friends or acquaintances of Manning, including three members of the Bryant family into which his sister had married, saw him at the Miller dance on New Year's eve. The testimony of many of these was replete with detail. The persons with whom he went to the dance, and those with whom he left it, testified. A number of the women with whom he danced told about it. They were, in general, the wives and daughters of railroad employees and factory workers, accompanied by their husbands, fathers and mothers, who were watching the old year out. Some of the witnesses narrated that when midnight came whistles and bells were sounded over town and proceedings at the dance suspended while certain of the guests discharged firearms out in the yard. Another incident calculated to fix the event in mind was that while Miss Helen Bryant, a sister of Manning's brother-in-law, Leroy Bryant, was dancing with Manning her knee became dislocated and he had to get another partner, Mrs. Patterson. The dance began about nine o'clock and ended about three. Practically all these witnesses said Manning was there throughout this whole time.

The defendant Scobee did not attend the Miller dance. Returning to Fort Madison from the trip to Baring and Gorin, on the evening of December 30, he said he spent the night and the next morning (December 31) in his home and that afternoon drove down town in his car with his wife. She obtained employment in a restaurant, to begin the next day. During the rest of the week each morning he would take their three children to his mother's and keep them there until his wife returned early in the afternoon. He was in bed asleep New Year's eve when the celebration heretofore mentioned took place. This testimony was corroborated by Scobee's wife and mother, by Mrs. Hereford and Frank Smith, two of his neighbors, who saw him coming and going from his home, and Mrs. Virginia Walker who noticed him driving in his car with his wife the afternoon of December 31.

Officer John Caffer, above mentioned, said he was at the police station in Fort Madison when the defendants were brought in the morning of January 5. He denied that on that occasion Manning first said he was or might have been in Baring on Monday, Tuesday or Wednesday and later in the conversation settled on Monday as the date of the trip, as (roughly) the State's witnesses Simpson and Patterson had testified. Along the same line, Manning was asked on cross-examination if he had not made a statement in the office of Mr. Brown, prosecuting attorney, in Edina, when he was brought there from Fort Madison, that he was in Baring *either* on December 30 or 31, but *thought* it was the former date. He answered he couldn't remember. He admitted he did not tell on that occasion

about being at the Miller dance on New Year's eve but said he did tell the sheriff and deputies while being taken from Edina to Kirksville later the same day. Scobee admitted that when first questioned in the prosecutor's office he was uncertain whether the date of his trip to Baring was December 30 or 31, but he asserted he looked at a calendar and became positive it was December 30, and said so at the time. Both defendants denied altogether that they had been in Edina the night of Decembr 31 and purchased gasoline from Mr. Marget, as the latter and the State's witnesses Zugg and Burns had testified.

It will be recalled the prosecuting witness, Eyler, testified the defendants told him just before they robbed him that they had come in on the night train. The defense produced three witnesses, Joseph Brennan, Ed. Robinson and Henry Mauck who were passengers on that train. They said four people got off at Baring but that none of these were the defendants. Mr. Mauck stated two of the passengers who alighted were pipe line people he had seen before and that they carried a grip. The defense exhibited to the third witness (Brennan) a grip in the possession of the State, left by the robbers, and he said it was similar to the one carried by one of these passengers though less broken. Then he said he would swear it was the same grip. Charles Collins a restaurant keeper in Baring said two strangers were in his restaurant the night of December 31, but he was unable to say they were the defendants.

The defendants denied the grip and the blanket, rope and old coat found at the scene of the robbery belonged to them and expressly denied any connection with the crime. Their reputations in Fort Madison as law abiding citizens were shown to be good, each by six or seven witnesses.

■ ■ I. The first assignment of error is that the verdict and judgment should be set aside because they were so much against the weight of the evidence as to indicate passion and prejudice, citing State v. Harmon (Mo.), 296 S. W. 391, 396, and cases there referred to. But a reading of that decision will show it is an authority against defendants rather than for them. In outline the facts were singularly like those relied on by the defendant Manning in this case. The defendant had been convicted of robbery on the sole testimony of the prosecuting witness identifying him as one of the robbers. His defense was an alibi supported by the positive testimony of eight witnesses that they saw him at a public dance at the time. This court announced the familiar rule that it would not and could not pass on the weight of the evidence even though it might appear the preponderance was with the defendant and that the circuit judge should have granted a new trial on that ground.

228

The sole function of this court is to determine whether the State produced substantial evidence. That it did so in this case cannot be questioned. The defense did not deny that Eyler had been robbed and left in the field when and as he testified. The defendants admitted they had been in Baring thirty-six hours before the robbery, instead of twelve hours as the State's witnesses testified. The identification by the latter, some as to Scobee and some as to Manning, was positive. The defendants utterly denied being in Edina late on the night of December 31, whereas the testimony of the State's witnesses Zugg, Marget and Burns, especially Burns, identifying them, or one or the other of them, was definitely to the contrary. There is evidence that when the defendants were apprehended and questioned they could not at first remember certainly whether their trip to Baring had been on December 30 or December 31—only five or six days before. Scobee admits this; and Manning concedes he did not tell the Knox County prosecutor about being at the Miller dance on New Year's eve, though that was the incident which figured most prominently in his defense.

The prosecuting witness Eyler positively identified Scobee as one of the robbers, and Manning also with as much conviction, though having had less opportunity to visualize his appearance. But Eyler was not with the robbers merely for a fleeting moment in a state of mental tension. They drove him out into the country, bound and gagged him, and talked to him and with each other. Certainly in these circumstances his senses would have been on the alert to note such facts as the size, general appearance and movements of the men and the sound of their voices. Such evidence is competent and substantial. [State v. Riddle, 324 Mo. 96, 102, 23 S. W. (2d) 179, 182.]

While free to say we are impressed with the testimony produced by the defendants, and especially by the great number of witnesses who swore they saw Manning at the Miller dance in Fort Madison throughout the night (almost) of December 31, yet we cannot, under the guise of ruling on a question of passion and prejudice, assume to say this evidence must be taken as outweighing that adduced by the State. The trial was orderly; the trial judge ruled dispassionately on the questions submitted to him; nothing was done to inflame the jury. Unless we depart from a long line of cases such as State v. Harmon, supra, and State v. Caviness (Mo.), 326 Mo. 992, 33 S. W. (2d) 940, 943, we cannot interfere with the verdict or, looking to the cold record alone, substitute our judgment for that of the circuit judge who saw and heard the witnesses and was cognizant of everything that occurred.

II. The next assignment is that Instruction No. 1 given for the State was erroneous in this: it told the jury if they found from

the evidence beyond a reasonable doubt that the defendants robbed the prosecuting witness, Eyler, of "any of the money and personal property . . . described in the information" they should find them guilty, etc. It is contended this reference to "the information" in describing the property taken must have meant the *original* information whereas the cause was tried on an *amended* information and the original information was not before the jury. Appellants' theory is that the instruction therefore went outside the record. There is nothing in this point. Indeed appellants' counsel do not refer to it in the argument in their brief. The instruction obviously refers to the information on which the case was tried. Furthermore, appellants did not deny that Eyler had been robbed of the property specified in the information. Their sole defense, as stated by their counsel during the trial, was that the defendants were not the robbers and were elsewhere at the time. The error, if error there was, was not substantial as to them.

■ III. Instruction No. 6 for the State told the jury: "If you have a reasonable doubt of the defendants' guilt, you should acquit, but a doubt to authorize an acquittal on that ground, ought to be a substantial doubt touching defendants' guilt, and not a mere possibility of their innocence." Appellants assert the instruction was prejudicially defective in that it coupled the two defendants together, implying they were either both guilty or both innocent, and that unless the jury had a substantial doubt as to the guilt of both defendants, they should convict both. On this point State v. Craft (Mo.), 23 S. W. (2d) 183, 186, and State v. Lambert, 318 Mo. 705, 709, 300 S. W. 707, 709, are cited. The Lambert case discusses the point at some length and holds that where two or more defendants are prosecuted jointly, it is the duty of the trial court, whether requested or not, in instructing on all the law of the case to tell the jury they should acquit or convict the defendants severally, any one or more as the evidence may warrant, and that the law does not require all to stand or fall together. The Craft case announces the same rule.

In this case however, the court gave an Instruction No. 3 for the State covering that precise point. It said: "You may find one of the defendants guilty and the other not guilty or, you may find both of the defendants guilty or both not guilty. By your verdict you will determine whether one or both *or* (are) guilty or innocent and your verdict should so state your findings." This fully advised the jury of their duty. Instruction 6 was not in conflict with Instruction 3, and the two, read together, properly declared the law.

■ IV. The State's Instruction 8 said: "Although the defendants are jointly informed against and tried; yet as to each you should make a separate finding, and, if you should find both or either guilty, you should state in your verdict the finding and punishment as to each separately." Appellants argue: "the effect of this instruction is to tell the jury that they should punish each of the defendants separately regardless of whether or not they found both or either guilty;" and they maintain this vice is not cured by the State's Instruction 3 quoted above. In our view the meaning of the instruction is clear enough: that the verdict shall make a separate finding as to each defendant; and that as to each the punishment shall be separately assessed if he is found guilty.

We find no error in the record proper or in the matters of exception upon which error is assigned in appellants' brief. The real point in the case is the one earnestly argued by appellants' counsel, that the verdict was against the weight of the evidence. That is a matter beyond our reach. The judgment is affirmed. All concur.