**STATE of Missouri, Respondent,**

v.

**Ronald R. BOLANOS, Appellant.**

**No. WD 38685.**

Missouri Court of Appeals, Western District.

Nov. 10, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 29, 1987.

Application to Transfer Denied Feb. 17, 1988.

Sean D. O'Brien, Public Defender, David S. Durbin, Asst. Public Defender, Kansas City, for appellant.

William L. Webster, Atty. Gen., Carrie Francke, Sp. Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P.J., and PRITCHARD and CLARK, JJ.

PRITCHARD, Judge.

By the verdict of a jury appellant was convicted of forcible rape, three counts of armed criminal action, two counts of forcible sodomy, and one count of stealing. As a persistent offender, he was sentenced to 20 years for the rape, 20 years for armed criminal action, 20 years for each of the two counts of sodomy, and 5 years for stealing, a total of 85 years.

On July 21, 1985, the victim lived at 1811 Lawn, Kansas City, Missouri. Late Sunday evening on that date, she returned with her husband and two children from her father-in-law's funeral. The entire family settled down on the bed in the master bedroom. Sometime after going to sleep, the victim was awakened by a knife to her throat, a hand to her mouth, and a voice saying, "Don't wake him [the husband] or I'll kill you." Lights which had been left on when she went to bed had been turned off, but there was a streetlight outside the three bedroom windows so, as she testified, the victim could see from the light coming in there. She got a second glimpse of the intruder when she got out of bed on his orders, observing his silhouette. The intruder led her into the dining room with the knife to her back where she removed her nightgown and it was used to blindfold her. She suggested that if he did anything in the house he would wake up her husband and suggested that they go outside. He led her blindfolded outside the house where they crouched behind a shrub. There he forced her to perform fellatio on him, then forced her to submit to cunnilingus. She felt the knife throughout this time, and he kept threatening her. Finally he told her he was going "to make love" to her, and got on top of her and performed sexual intercourse upon her. He told her that he did not want her to tell her husband or anyone, including the police, or he would come back and kill her. He said he would be watching her, and he made her promise to leave the side door open for him in the future.

The victim also testified that appellant took her husband's wallet from his pants pocket, and her wallet from her purse,

throwing its contents on the floor. Over $200 was taken. Viewing a videotaped lineup, Baxter was able to pick out the man who raped and sodomized her and held a knife to her neck, from his voice and by his build and hair. She made an in-court identification of appellant as being that man.

In Point I, appellant contends that the trial court erred, over his objection, in admitting the victim's testimony and Exhibit 3, a videotape of a lineup in which she identified appellant at a pre-trial lineup, in that the circumstances of the lineup were impermissibly suggestive and there was an insufficient basis for identification at the time of the offense because only three of the five persons in the lineup had moustache; only two had visible shirt collars; two greatly exceeded appellant's height and weight; and at the time of the offense the victim was able only to see her attacker's silhouette, hear his voice, feel his moustache and smell alcohol on his breath.

The lineup persons were: # 1, Mike Rodriguez, 187 lbs., 5'9", no Mexican accent, slightly balding; # 2, Charles McMullin, 200 lbs., 6'1", dark complexioned, facial hair, dress shirt; # 3, appellant, 185 lbs., 5'7", Mexican accent, facial hair; # 4, Emanuel Tidona, no accent; # 5, Pete Edlund, 210 lbs., 6'1", balding, blue collar, facial hair. All of the persons were white. Because the victim arrived late she did not see the live lineup, but viewed only the videotape, which she viewed less than 24 hours after the incident. She picked out appellant, the # 3 man, as being her assailant, noting thereon a police I.D. card and that it was by voice only. [Each of the five men shown on the videotape spoke the same words. The victim's testimony was that during the course of the incident, the assailant spoke to her many times, and, although perhaps an exaggeration, "hundreds of times."] At one point in trial, she testified her identification was based upon voice, build, height, stature and hair; later in trial she testified that she was unable to identify the man by appearance, but could do so only by his voice. On deposition, she testified she had a great hearing loss in one ear, but she denied having any hearing problem at trial. On the pre-trial hearing of the motion to suppress, the victim described her assailant as not being tall, probably five six, five seven, stocky build, dark hair, with a moustache.

Although appellant focuses on the discrepancies and differences in the descriptions of the five persons in the videotaped lineup, that is not the dispositive issue in this case. It rather is, as the evidence shows, an identification *alone* of appellant's voice. It matters not that the victim was at police headquarters to view some persons who might be suspects, as could be inferable. The police, however, did not tell the victim that they had a suspect in custody, but merely that they wanted her to view a lineup. Her alleged anticipation was not rendered suggestive by her knowledge, if any, that her assailant might be present in the lineup array. *State v. Stephens*, 708 S.W.2d 345, 348[2] (Mo.App.1986), and cases cited. The sufficiency of the identification turns upon the victim's identification of appellant as the assailant by his voice. That alone is sufficient. See *State v. Bell*, 300 S.W. 504, 505[1] (Mo.1927), where it was said, "Hearing is one of the five senses, and knowledge acquired through it is as certain as though acquired through any other sense. The cause was properly submitted to the jury."; *State v. Riddle*, 324 Mo. 96, 23 S.W.2d 179, 182[1, 2] (1929), where the court said, "The force of the identification of defendant by means of his voice was a question of fact and within the province of the jury, and, as the facts made a submissible case, the weight of the testimony was for the jury. The identification of defendant did not depend wholly upon circumstantial evidence, as defendant contends, for the identification of a person by means of his voice is direct evidence of identification, as much so as though the identification had been made through sight."; *State v. Ransom*, 340 Mo. 165, 100 S.W.2d 294, 296[1, 2] (1936); and among the many cases on the subject, see Anno. Identification—Accuseds Voice, 70 A.L.R.2d 995, and Later Case Service thereon, page 487, et seq.

In view of the fact that the victim's identification descended to voice only, as her testimony rather clearly shows, the physical makeup of the lineup would seem to be irrelevant. It has, however, been ruled that identical appearances of people in lineups is not required, *State v. Little*, 674 S.W.2d 541, 545 (Mo. banc 1984), and that a lineup is not suggestive merely because the individuals comprising it had dissimilar physical appearances, *State v. Cooper*, 708 S.W.2d 299, 305 (Mo.App.1986). The factors here for determining reliability of the victim's voice identification are comparable to those listed.in *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), in that (1) she had the opportunity to hear the criminal's voice numerous times at the time of the crimes; (2) she had a high degree of attention, he being in close proximity to her and threatening her with a knife; (3) she did give a prior description, but that is irrelevant as noted; (4) she demonstrated certainty that appellant's voice was the same as her assailant to the scene of the crimes, testifying, "Q. What was it about the voice that you—that made you recognize it? A. It was the same voice. It was—it was the same voice. Q. Is there any doubt in your mind that it wasn't the same voice? A. There's no doubt in my mind, none whatsoever." The victim had the opportunity to compare appellant's voice with those of the four other men in the lineup. No suggestiveness anywhere appears. Point I is overruled.

In Point II, appellant claims that the trial court erred in overruling his motion to exclude the testimony of Terry Carter relating to an assault upon her the day after the assault upon the victim here because it was inadmissible evidence of other uncharged crimes.

In connection with this claim, the facts are these: Terry Carter testified at trial that about 2:30 a.m. on July 22, 1985, she was awakened, while sleeping with her two children, by a man who had one hand over her mouth and a knife at her throat. One child awakened, and the man told Terry to tell the child not to look at him or he would slice her up in little pieces. Terry told her to go back to sleep, that "it's okay." The man walked Terry around the bed toward the door with a knife at her throat. She was able to see more of him as they went by a large mirror, there being some light from a make-up mirror. She was escorted toward the back door, and she learned that the man had not harmed her brother who was sleeping on a divan in the living room. Terry decided that she was not going outside with him, and she backed out from him, getting a cut on her forehead and arm. She picked up a standing ashtray from under a kitchen cart and started swinging it and screaming, and he started stabbing at her, saying, "Bitch, shut up or I'll kill you." She could see his face at that time. She called for her brother, Ricky, who awakened and got to the door. The man fell over the kitchen chair which slowed him down some. Terry told her brother that he had a knife and that he was going to try to rape her, and to "Get him." Ricky went after him but he was out the door already. The police were called and later Terry went to her father's house where she sat on the front porch drinking coffee. Terry looked down the street and saw the same man, who broke into her house, walking down the street. She told Ricky it was the same person and he agreed. She then ran into the house and called the police. The next morning she viewed a lineup and was able to pick out the man who attacked her. She made an in-court identification of appellant as being that man. The attack occurred at 2233 Poplar, which was one block over and four blocks north of 1811 Lawn.

The general rule is that evidence of uncharged crimes is inadmissible unless it has a legitimate tendency to establish a defendant's guilt of the crime charged. *State v. Shaw*, 636 S.W.2d 667, 672[4] (Mo. banc 1982). That evidence is admissible, "when it tends to establish motive, intent, the absence of mistake or accident, *a common scheme or plan embracing the commission of two or more crimes so related that proof of one tends to establish the other, or identity of the person charged*" with the crime. *State v. Trimble*, 638 S.W. 2d 726, 732 (Mo. banc 1982). [Emphasis

supplied.] The modus operandi of the attack on Terry and the attack on the victim here were so similar that the evidence of the attack upon Terry becomes admissible under the above italicized exception to the general rule. Here, the attack upon Terry occurred one day after the one upon this victim, and within about four blocks of her home. Both were awakened while sleeping with family members in the wee hours of the night, with a knife at each of their throats. At knife point they both were escorted through the houses, and clearly the man intended to take Terry outside as he did the victim here. Terry identified the man as being appellant by sight, the victim here by his voice. In *State v. Young*, 661 S.W.2d 637, 639[6–8] (Mo.App.1983), the matter of admissibility of the testimony of two other women (other than the prosecutrix) who described similar attacks upon them and identified defendant as the perpetrator was taken up. It was there said, "In the instant case, we find the evidence of defendant's sexual attacks upon victims other than the prosecuting witness properly admitted (T)o prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused. * * *." See also, at page 640, the discussion of the similarity of the evidence of the three attacks, the court there saying, "We find defendant's methodology in the three attacks sufficiently unusual and distinctive so as to allow the introduction of evidence of the crimes as defendant's 'handiwork', thereby establishing defendant as the perpetrator." See also the previous case involving the same defendant, *State v. Young*, 643 S.W.2d 28, 29–30 (Mo.App.1982), and the same issue; Annot. 77 A.L.R.2d 841 (1961); and *State v. McDaniels*, 668 S.W.2d 230, 232 (Mo.App. 1984). Appellant also claims that Terry's testimony as to another crime was prejudicial. It was incriminating and therefore prejudicial by definition, *State v. Shaw*, 636 S.W.2d 667 (Mo. banc 1982), but was admissible. Point II is overruled.

■ In Point III, appellant claims that the trial court erred in sustaining the state's motion in limine to exclude the testimony of Nancy Lane and Ray King concerning an assault upon Lane by a person other than appellant which occurred in the general area of the homes of the victim here and that of Carter, in August, 1985, when appellant was in jail. Apparently, appellant sought to inject the issue that someone other than appellant might have been the culprit in the instant crime and the attempt upon Carter. No evidence was offered linking the unknown assailant of Lane either to the assault upon the victim here or to that of Carter. In *State v. Stokes*, 638 S.W.2d 715, 723 (Mo. banc 1982), *State v. Umfrees*, 433 S.W.2d 284, 287–288 (Mo. banc 1968), was quoted, "Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime. * * *." The Umfrees rule was approved in *State v. Easley*, 662 S.W.2d 248, 251[5] (Mo. banc 1983). See also *State v. Wilhite*, 587 S.W. 2d 321, 325 (Mo.App.1979); and *State v. Williams*, 575 S.W.2d 838, 840 (Mo.App. 1978). Appellant claims also that he was treated unfairly because his motion in limine was overruled and the state's was sustained. The claim is without merit because, as set forth above, appellant was by direct evidence linked to the crimes upon the victim here and to the attempt upon Carter. Point III is overruled.

■ In Point IV appellant contends the trial court erred in preventing his inquiry upon voir dire about the venire's exposure to the television movie "Convicted", and about participating in eye-witness reliability studies. He says the court's action was an abuse of discretion because the inquiries were reasonably calculated to determine challenges for cause and to assist in making peremptory challenges in this eye-witness identification case.

As to the movie, appellant was able to bring out from a venireperson that she had seen it and it had to do with mistaken identity. Other persons on the panel indicated they had seen it. At this point, the state's objection to further inquiry as to the movie on the ground of relevancy to this case was sustained. As to participating in eye-witness reliability studies, one venireman said that he had done so in

psychology class in 1986, a short part of a book about the fact that eyewitness testimonies are not always ironclad. Upon the state's objection, the trial court ruled that counsel would not be permitted to go into specifics of the studies, but counsel was permitted to ask whether or not their having participated in such a class would influence their judgment. No one else answered that they had participated in any studies or studied the reliability of eyewitness testimony. It is apparent that appellant got before the jury panel "the essence" of unreliability of eyewitness identification, and any curtailment of inquiry beyond that (as to specifics) was clearly within the trial court's discretion. See *Lineberry v. Shull*, 695 S.W.2d 132, 135[1–3] (Mo.App.1985); *State v. White*, 722 S.W.2d 92, 95 (Mo.App. 1986); *State v. Lumsden*, 589 S.W.2d 226, 229 (Mo. banc 1979). Point IV is overruled.

Appellant is hispanic, a caucasian. At the conclusion of the voir dire examination, the state peremptorily struck all three black persons on the jury panel. Appellant says, in Point V, that action violated his right to have a fair and impartial jury drawn from a fair cross-section of the community as provided by the Sixth Amendment to the United States Constitution. Appellant did not raise the Sixth Amendment issue at the time the peremptory strikes were made by the state. Rather, he relied upon the equal protection case (under the Fourteenth Amendment) of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), both at the time of the strikes and his motion for new trial. Batson, of course, does not apply as it is limited to cases where a defendant shows "that he is member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." 106 S.Ct. at 1723. See also *State v. Christensen*, 720 S.W.2d 738, 739 (Mo.App.1986); *State v. Smith*, 1137 S.W. 2d 731 (Mo.App.1987). Had the Sixth Amendment Claim been timely raised, it would have availed appellant nothing because the U.S. Supreme Court has declined to extend the fair cross-section requirement thereunder to the selection of *petit* juries. *Lockhart v. McCree*, 476 U.S. 162, 172,

106 S.Ct. 1758, 1764, 90 L.Ed.2d 137, 147 (1986), "We have never invoked the fair cross-section principle to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. See *Duren v. Missouri*, 439 U.S. 357, 363–364, 58 L.Ed.2d 579, 99 S.Ct. 664 [668–669] (1979); *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, [701], 42 L.Ed.2d 690 (1975) ('[W]e impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population'); * * *." The Supreme Court has thus spoken on the subject.

On this appeal, appellant attempts also to invoke Const. Mo. Art. I, Sec. 22(a) (1945), in asserting that he was denied a fair and impartial jury. That section provides, "That the right of trial by jury as heretofore enjoyed shall remain inviolate; provided that a jury for the trial of criminal and civil cases in courts not of record may consist of less than twelve citizens as may be prescribed by law." Cited in argument, is Const. Mo. Art. I, § 18(a) (1945), which provides in part that in criminal prosecutions an accused shall have the "right to a speedy public trial by an impartial jury of the county." Thus, neither of these constitutional provisions were presented to the trial court and are not preserved for review under such cases as *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); and *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499 (1979) [both being decided before *Batson*, supra]; *State v. Gilmore*, 103 N.J. 508, 511 A.2d 1150 (1986); and *State v. Neil*, 457 So.2d 481 (Fla.1984), which cases applied their state constitutional provisions relating to trial by a fair and impartial jury as a counterpart of Const. U.S. Amend. VI. Point V, raising the issue of improper jury selection by the use of peremptory challenges, is overruled.

By Point VI, appellant contends that the trial court improperly instructed the jury in defining "reasonable doubt" as required by MAI–CR2d 2.20. *State v. Guinan*, 732 S.W.2d 174, 177 (Mo. banc 1987), ruled the contention adversely to appellant's claim, so Point VI must be overruled.

■ In deposition testimony prior to trial, the victim testified that she had a great hearing loss. At trial she admitted so testifying. Appellant's counsel then sought to inquire if she had said that she had a great hearing loss in one ear. The state's objection on the ground that she had already answered the question was sustained. By Point VII, appellant claims that the court's ruling, even though partially repetitious, was erroneous as it prevented him from fully developing the victim's hearing impairment. The court did not abuse its discretion in limiting the cross-examination on this subject. The question had in fact been asked and answered. Point VII is overruled.

■ Eric Selle, Terry Carter's brother, had chased the intruder from her home. In describing that, he testified that an officer got a report of an attempted rape at 5915 East 28th, some distance from the Carter home. Appellant's objection that this testimony was evidence of another crime was sustained, and the court instructed the jury to disregard it. Any error was thus cured. The requested drastic remedy of mistrial was not necessary. Point VIII, as to this issue, is overruled.

The judgment is affirmed.

All concur.