State of Missouri, Respondent, v. Joseph L. Ivanhoe, Appellant.
—177 S. W. (2d) 657.

Kansas City Court of Appeals. January 31, 1944.

*H. P. Lauf, James T. Blair, Jr., John O. Bond, James T. Riley*
and *Edgar J. Keating* for appellant.

202

*C. J. Quimby, W. O. Jackson,* Assistant Attorney-General, and *William L. Vandeventer,* Special Assistant Attorney-General, for respondent.

BOYER, C.—The grand jury of Cole County returned an indictment against defendant. The substance of the offense charged is

that on or about the 8th day of May, 1941, and while defendant was a member of the House of Representatives of the Sixty-first General Assembly of Missouri, and intending to betray his trust, and violate his duty as a member of the House, he did then and there wilfully, unlawfully and corruptly propose and offer to receive the sum of $3500 from certain named individuals as a bribe, gift, gratuity and reward to induce him to vote and to secure the votes of other members of the House of Representatives for the enactment of a measure, then pending before the House and before its committee on insurance, known as House Bill No. 376.

Upon trial the jury found defendant guilty as charged in the indictment and assessed his punishment at a fine of $100, and two months in jail. Judgment and sentence of the court followed the verdict. A motion for new trial was in vain and defendant duly appealed.

Points raised on appeal pertain to the alleged error of the court in refusing defendant's instruction in the nature of a demurrer to the evidence offered at the close of the case; in giving instructions S-1 and S-2; and that the indictment states no offense punishable under the laws of Missouri.

A statement of the evidence should be commensurate with the assignments made, and with that in view the record has been read. The demurrer challenges attention to all the evidence which appellant says fails to show that defendant intended to request any money as a bribe for himself or anyone else. Certain facts in reference to the origin and nature of House Bill No. 376, the persons interested in behalf of the bill, those opposed to the bill, and proceedings prior to May 8, 1941, may be stated as admitted or not disputed as follows: Representatives of the Missouri Association of Insurance Agents, other organizations of insurance agents, and insurance brokers had sought unsuccessfully in the past to procure legislation which they thought designed to raise the standards of their business. Such legislation was favored by the State Insurance Department, and sometime in the latter part of 1940, prior to the 1941 session of the Legislature, representatives of the Missouri Association of Insurance Agents conferred with representatives of the Insurance Department, and the superintendent thereof designated Mr. Charles J. Harvey, one of his legal assistants, to work with the insurance men and to prepare a bill for introduction in the Legislature. After many conferences and prolonged consideration a bill was prepared and was introduced in the House of Representatives March 10, 1941, as House Bill No. 376, by Mr. Bruner, a member of the House who had been selected for that purpose. The bill was referred to the House committee on insurance. Defendant was a member of that committee and Mr. Frank Robison was chairman. At least two public hearings upon the bill were conducted by the committee, at one of which the proponents appeared

and at the other the opposition was heard. Both meetings were largely attended. There was much controversy over the bill and a large number of amendments were proposed. There was no conclusion reached or vote taken by the committee upon the bill and finally, at some date prior to May 8, 1941, it was referred to a subcommittee of which defendant was chairman.

Persons interested in the passage of the bill were concerned about the delay and nonaction of the committee and were interested in having it reported out of the committee. The ones who were particularly active in behalf of the bill, and who had been in repeated conferences with Mr. Harvey, included Mr. John W. Rodger of St. Louis, manager of the Insurance Board of that city; Mr. Oliver Blaze of St. Louis County, a member of the Missouri Association of Insurance Agents; Mr. Basil Sparlin of Springfield, Missouri, president of the Missouri Association of Insurance Agents, and Mr. William J. Welsh of Kansas City, who had been president of the State Association immediately preceding Mr. Sparlin. After reference to the bill to the sub-committee of which Mr. Ivanhoe was chairman, Mr. Harvey notified Mr. Rodger of that fact on or about May 7, 1941. In response to such notice, Mr. Rodger, Mr. Blaze and Mr. Sparlin all met in Jefferson City on May 8, 1941, and conferred with Mr. Harvey about how to promote the bill in committee and secure action thereon. The four men went to the Capitol building to see Mr. Ivanhoe. It was then about noon. The Legislature had adjourned and most of the members were on the Capitol lawn witnessing a ceremony of releasing carrier pigeons after the Governor had approved a bill for their protection. The four men went to the gathering on the lawn and Mr. Harvey found Mr. Ivanhoe, took him to the other men and introduced him. He was invited to accompany them and Mr. Harvey for lunch, and they all went to the restaurant in the Central Hotel. Upon being seated in a booth they had some drinks and ordered lunch, but the place was crowded and noisy and on suggestion of Mr. Blaze all five of the party retired to a room in the hotel where they had their luncheon served. Immediately after lunch, and about one o'clock, Mr. Harvey left to meet an appointment as he had previously informed the party he would be required to do. This left the three insurance men and Mr. Ivanhoe alone. They conferred for some time about the Bill, but what was said and done there by the different parties is the principal matter in dispute. Mr. Ivanhoe left the conference and very shortly thereafter Mr. Harvey returned, and was in the room but a short time when the telephone rang and he answered it. Mr. Ivanhoe was calling and reported that he had a lobbyist by the name of Eugene J. Damon who would come up if the parties wanted to see him. Mr. Harvey reported to the three men and asked if it would be all right for Damon to come. They consented and Mr. Harvey answered back

over the telephone that it would be all right and to send him up. A few minutes thereafter there was a knock on the door and Damon was admitted, and there was a conference with him in the presence of Mr. Harvey, reported differently by the witnesses. There was no conclusion reached and the meeting broke up.

The questions of fact in controversy pertain to what was said and done by the defendant during the conference in the hotel room, and thereafter, and what was said by the respective parties in reference to the Bill, the amount and use of money to promote its passage, and the conference with Damon. There is also controversy over what Mr. Harvey did and said at different times, and especially in reference to his alleged statements as to the amount of money required to promote the bill and how it would be divided, and his interviews and conduct with Mr. Welsh.

Mr. Rodger testified that after Mr. Harvey left the hotel room, "we naturally opened up the subject of House Bill 376, to see what was the matter with it, why we couldn't get it out of committee and Mr. Ivanhoe proposed that he could get it out of the committee for $500. . . . I think I said that we were not interested in getting things out of committees so much as we were to get it out into the House and Senate and get the Governor's signature to it. And he said, I don't know what words were bandied about, that he said that he thought he could handle the House for $3500. He knew where he could get the votes." They talked more about the bill, but witness did not remember just what language was used. He said that soon Mr. Ivanhoe left and in fifteen or twenty minutes Mr. Harvey came back.

On cross-examination Mr. Rodger said that there had been some discussion of the bill before they reached the hotel room and repeated his previous testimony that Mr. Ivanhoe said "that he could get it out of the House Committee for $500," and that Mr. Ivanhoe said he could handle the House for $3500, and that witness replied: "We are not in the market to pay anything of any kind." He also said that he had not discussed with Mr. Harvey the matter of employing a lobbyist and that no mention had been made of the fact that they were wanting to see a lobbyist. Witness was asked: "What brought Mr. Damon to see you that afternoon?" He answered: "Well, the circumstances were these: After Mr. Ivanhoe left, I don't know what time it was, how much later, Mr. Harvey came back in the room, and a short while later the telephone rang, and Mr. Harvey answered it, and I think the language was to the effect: 'O. K. Joe, send him up.' " Nothing had been said during the luncheon about sending anybody up and no mention had been made of the fact that they were wanting to see a lobbyist. In reference to the interview with Damon this witness testified that he introduced himself bluntly as a lobbyist, and said that he thought he could help them for $5000. The interview

was brief and Mr. Damon got scant attention. He excused himself after a short time and said he had to catch a train. Witness denied that it was proposed to Damon to pay him provided the bill became law.

Mr. Blaze testified in reference to his connection with the Insurance Brokers Association of St. Louis, his connection with, and interest in, the promotion of the bill in question, and his attendance at both hearings accorded by the full committee on insurance. He related that he had obtained information from Mr. Rodger to the effect that he had been advised by Mr. Harvey of the appointment of a sub-committee and that it would be well to go to Jefferson City to meet the chairman of that committee. The trip was arranged for the following day and upon arriving at Jefferson City he and Mr. Rodger met Mr. Sparlin at the station and the three proceeded to see Mr. Harvey at the Insurance Department, who suggested that they go to the Capitol and meet Mr. Ivanhoe who had been appointed chairman of the sub-committee. The procedure from there on was similar to that described by Mr. Rodger up to the point of the interview with the defendant in the hotel room. After Mr. Harvey had departed, Mr. Blaze described the interview as follows: "I explained that our purpose in being in Jefferson City was to discuss the House Bill that we were interested in, No. 376. . . . We explained that we were very much interested in the bill, and we hoped that now that a smaller committee had been appointed that the bill would come out of committee, and we wanted to know what we could do to assist in having the bill come out of the committee. . . . Q. Did you receive any reply? A. Yes, Mr. Ivanhoe said that he could get the bill out of the committee for us for $500. Q. What was said then, if anything? A. Mr. Rodger said that we were not interested in just getting the bill out of committee. We were interested in having the bill enacted into law. Q. And was there any further conversation? A. Yes. Mr. Ivanhoe said that he could handle it through the House and that that would cost $3500. . . . I explained that we didn't have any such purpose, that in the first place our organizations had not given us any such instructions, and that we could not enter into any such discussion." He said that Mr. Ivanhoe left and there was no further conference with him.

On cross-examination he described the opposition to the bill as coming from the St. Louis Real Estate Exchange, automobile finance companies, and small loan companies. He said that the bill had been revised many times and that amendments had been offered; that there was no discussion with Mr. Harvey about hiring a lobbyist; that nothing had been said about any money until Mr. Harvey left; Mr. Ivanhoe did not say that he would vote for the bill for the amount of money mentioned but said: "I can get it through the committee for $500, and I could get it through the House for $3500." Witness said that

he reported what had transpired to the legislative committee of the Insurance Brokers Association.

Mr. Sparlin testified that after having met Mr. Ivanhoe on the Capitol grounds "we told Mr. Ivanhoe that we understood that the Insurance Committee had been appointed—had been reduced to a sub-committee. . . . That he was chairman of that committee and we were interested in this House Bill 376, and we would like to discuss it with him. . . . He said he would be glad to discuss it with us." They then went to the hotel and to the hotel room. After Mr. Harvey left, witness said that the interest of the insurance men in the bill was explained and that they had been trying for years to get it, "and having knowledge of the fact that he had been appointed chairman of this sub-committee we thought we would come up and discuss it with him and see if there wasn't something we could do to get it moving along." The witness then quoted what Mr. Ivanhoe said in this manner: "Well, Mr. Ivanhoe told us that he could get the bill out of the committee for $500. And Mr. Rodger said that we were not interested in just getting the bill out of committee, we were interested in getting it out of the committee and through the House and getting the Governor's signature to the bill. Q. Did he say what he could do that for? A. He said he could get it through the House for $3500. Q. What did you say to him? A. We told him we were up there to do anything we could legitimately to get the bill passed, but we had no authority from anyone—that we had no authority to pay any money to anybody." Witness did not recall what defendant said to that, but this question and answer appear: "Q. Now, did he say anything else when you were talking to him about the $3500, about how much was going—what he was going to do with it? A. He made a remark about he thought he knew where he could obtain the necessary votes in the House to get it passed, but it might be that some of the other members of the House having knowledge of the fact that there was some money in circulation to get this bill through, he might need some extra."

On cross-examination this witness was questioned in reference to the time and duration of the meeting and said that they arrived at the hotel somewhere between 11:45 and 12 o'clock, but would not fix the exact time that Mr. Ivanhoe left. He said that Mr. Harvey left first immediately after lunch. Witness was also questioned about the visit and interview with Mr. Damon and how he happened to come to the room, and he repeated in substance the testimony of Mr. Rodger on that subject. He said that Mr. Damon represented himself as a professional lobbyist; that after Mr. Harvey returned to the room he answered a telephone call and said: "All right, Joe, send him up." No request had been made to anyone to send anyone up to see them. He denied that it was stated that they could get a fund somewhere around $5000, and that the large insurance men would con-

tribute in order to obtain passage of the bill; and that no such statement was made by Mr. Blaze or Mr. Rodger; he did not hear an amount mentioned during the discussion with Mr. Damon as his attention was diverted, but understood from Mr. Rodger and Mr. Blaze that an amount was mentioned.

The defendant testified in his own behalf. After some biographical information he said that he started writing insurance in St. Louis in 1922, and specialized in industrial insurance; that there was much opposition to House Bill 376, and he was opposed to it because he deemed it detrimental to the interest of his business and that of his colleagues engaged in industrial insurance. The bill was never voted on in committee, but died there; he did not attend the meeting of the committee when a sub-committee was appointed, and did not even know that he was chairman of the sub-committee, but was informed by others that he was such chairman; he never called a meeting of the sub-committee to consider the bill. In reference to his activity and meeting with the insurance men on May 8, 1941, he said that he ate lunch at the Capitol lunch stand about eleven o'clock; that about noon he saw Mr. Harvey who said: "I got some insurance men here from St. Louis, and he would like for me to go over and talk with them. . . . I want you to meet them, he said, they are friends of mine. That is the way he introduced them to me." Mr. Harvey said the men had talked about lunch and suggested that they go to lunch. Defendant told Harvey that he had had his lunch, but agreed to and did accompany Mr. Harvey and the other men to the restaurant and the hotel room which they later occupied; that they got to the upstairs room sometime between 12:15 and 12:30; that some time was consumed waiting for and eating lunch and listening to Mr. Rodger tell stories about the nice times they had had while they were lobbying, and witness testified that finally Mr. Rodger said: "I will tell you, Mr. Ivanhoe, what we want. You know we want to get a bill in and, like the old days, give someone a lump sum of money and then he handles the bill in the committee and on the floor of the House, in the Senate, and get it signed by the Governor." And that Mr. Blaze said: "That is right, Mr. Ivanhoe. You know what we want to find out if it takes 500, 3500, or 5000 dollars to handle the bill, because we have heard it takes money and you know now we could raise this money. Of course, we are not going to raise it—take it out of the Association—because if something would come up they could find out. We will go back to St. Louis and we will get it from the big brokers." Defendant said he replied: "Now, gentlemen, I don't handle this kind of business. I make my living writing insurance, and now, what you are wanting, I believe you are looking for a lobbyist and I am not a lobbyist, and so gentlemen, I have got to go back to the House to vote." He further testified that as he was leaving he was asked whether he could suggest a lobbyist, to which he replied that he did not know

anybody off-hand, and they said: "Well, if you run across anybody send them to us." Defendant had no further conversation with them, and left the room and returned to the House where he met Mr. Frank Robison and told him that some insurance men wanted a lobbyist on that insurance agents' bill, and that Mr. Robison suggested that he get Damon. Mr. Ivanhoe was not personally acquainted with Damon, but had seen him around the House. Shortly thereafter Damon came to see him, identified himself, and asked if he wished to see him; he informed Mr. Damon that there were some lobbyists and insurance men over in the hotel who wanted somebody to handle their bill. Damon did not know them and Mr. Ivanhoe agreed to call them up if Damon wished him to do so. He called by telephone and Mr. Harvey answered. Mr. Ivanhoe reported that Mr. Damon was there and that if he wanted him he would send him over, and that Harvey said: "Yes, O. K. Send him over." This was reported to Damon who was told that "it was all right; they want you over there"; he said he was going over.

On cross examination defendant stated that he thought he left the meeting before Mr. Harvey did; that he didn't know he was chairman of the sub-committee but was told so, and didn't attend the meeting at which the sub-committee was named; that the chairman had the bill and wouldn't let him have it, and that he wasn't going to make any effort to get the bill out when he was opposed to it. He admitted that it was his duty to real bills and vote honestly and impartially on them. He denied that he ever made any statements to newspaper reporters that he was for the bill except on one minor point, and that he did not tell them he had no recollection of ever having met the insurance men. His testimony was to the effect that he had not understood the three men to be offering any bribe, but understood that any fund to be raised would be used legitimately. He denied he had suggested any amount to be paid a lobbyist; he went with them to the hotel as a matter of courtesy to Mr. Harvey.

Mr. Damon testified that he was an attorney of Kansas City; that he had been a member of the Legislature for the 1931 and 1933 sessions. He knew Mr. Ivanhoe but did not know Mr. Harvey; Mr. Robison told him Mr. Ivanhoe was looking for him; he found Mr. Ivanhoe and was informed by him that some friends of Mr. Harvey desired to hire someone to help on the passage of Bill No. 376, and not being acquainted with Mr. Harvey or the insurance men he requested Mr. Ivanhoe to telephone and see if they desired to see him. Mr. Ivanhoe did telephone and informed him that the parties desired him to call at the hotel; that on arrival at the hotel room, he was offered a drink but refused as he was in a hurry to catch a train; that they discussed the bill and the fact that there were numerous amendments and strong opposition, and finally one of the three insurance men said they would not pay any fee unless the bill became a law.

Damon would not accept employment on that basis and left. He denied that when he first came into the room he announced himself as a professional lobbyist, but did say that he told them he spent a lot of time around the Legislature lobbying on bills. He said he told them he expected to be paid a fee if he undertook employment to help with the bill, but positively denied that any definite sum of money was mentioned. He contended that the insurance men wanted to make a deal with somebody who would guarantee the passage of the bill and that they would not pay any money until the bill was passed, and that he would not accept employment on that basis.

Mr. Harvey testified in reference to his connection with the bill and claimed that it was primarily an agent's bill rather than one sponsored by the Insurance Department; that he attended hearings before the committee in support of the bill; that there were many amendments proposed; that he lived in the same ward with Mr. Ivanhoe and they belonged to the same political club; that Mr. Welsh of Kansas City was most active in drafting and in support of the bill, and on one occasion he had accompanied Mr. Welsh to the House chamber for the purpose of seeing Mr. Ivanhoe; that was some time in April, and Mr. Welsh reported to him at that time he had heard rumors that there was a price on the bill and he wanted to find out about it; that he replied that he did not know but he had heard rumors too; it was rumored that it would cost $500 or $1000 to get the bill through the House; that he had been hearing these things right along; that he then suggested to Mr. Welsh that he ought to get somebody to work on the bill and investigate the thing, and suggested that they might go over to the House and see Ivanhoe; that he might mention someone that he could suggest who would take the employment; that he and Mr. Welsh went over to the House but did not see Mr. Ivanhoe, according to his recollection, but saw someone else; he did not remember who, but whoever it was he explained the situation to him and what Mr. Welsh wanted and obtained a card of a law firm in St. Louis containing the name of Librach & Stolar; witness thought that it was Mr. Librach with whom he talked; he was also a member of the House, and that he was informed to get in touch with Mr. Stolar. The card and information were given to Mr. Welsh, and witness said that was the last he heard of it for a long time. Mr. Welsh desired to know what the man would charge for looking after the bill and witness informed him that he did not know, but if he worked for him he would probably have to pay him. In reference to the meeting in the hotel room, he did not remember any particular conversation; he never heard Mr. Ivanhoe ask for money, and left about one o'clock; that he was invited to come back and returned about two o'clock; the telephone rang, he answered it and Mr. Ivanhoe was calling and said he had a man named Damon, a lobbyist, who would like to talk to the insurance men; that this was reported to the

men in the room and they said it was all right to send him up; witness said he did not know Mr. Damon and had never seen him before. He related that when Mr. Damon entered the room, he said: "My name is Damon, and Joe Ivanhoe told me that you fellows wanted to see me, you wanted to engage somebody to work for you on your insurance bill." He explained that he had worked on matters of that kind; that he was not familiar with their particular bill, but would like to go into it with them if they thought they would like to hire somebody; as witness remembered it there wasn't any sum of money mentioned; that Damon proposed to work on drafting a committee substitute and get the bill lined up for passage before the committee and get it out; that the parties were interested in having the bill enacted into law and Damon said he couldn't guarantee anything of that kind; that ended the conference and Damon left.

On cross-examination Mr. Harvey was asked a number of questions in reference to statements made by him to Mr. Welsh, at a stated time and place, with a view of laying the foundation for impeachment. He denied making such statements. Upon further inquiry in reference to his visit to the Capitol with Mr. Welsh the witness said he was looking for Mr. Ivanhoe but did not find him, but saw Mr. Librach, who was also a member of the committee on insurance, and obtained the card bearing the name of Mr. Librach's law firm with the name of Stolar underscored, and suggested to Mr. Welsh that he see Mr. Stolar. Mr. Harvey admitted his interest in the case and that he had been jointly indicted with Mr. Ivanhoe for conspiracy in another case.

Three members of the House and three citizens of St. Louis testified to the good reputation of the defendant.

A portion of the journal of the proceedings of the House of Representatives on May 8, 1941, was offered and received in evidence tending to show that the House adjourned in the forenoon to reconvene at one o'clock, and tending to show that defendant was present. The wife of defendant testified that she was with her husband that day and that he was back in the House at one o'clock.

In rebuttal the State called Mr. William J. Welsh who testified in part that he was familiar with House Bill 376 and attended sessions of the General Assembly of 1941; that on the second day of April, 1941, he saw Mr. Harvey in his office, at which time they had a discussion about the bill and that Mr. Harvey made a statement in general words and to the effect that: "Here is a thing that you must know. I hear from what I consider reliable sources that there is no hope of favorable House Committee report on this bill without payment of a substantial sum." Witness could not repeat the exact words but stated definitely that the quoted words contained the substance of Mr. Harvey's statement. Witness then said to Mr. Harvey that he had heard of such a rumor the week before, but had no intention of treating such a suggestion seriously, and that Mr. Harvey then replied,

in substance, that it was not a rumor but that it was definitely a serious proposal. Mr. Welsh then asked him: "What do these things cost," and he replied "that the amounts varied with the bills, but in this case the definite figure was $1000." Mr. Welsh then said that he understood there were twenty-five members of the insurance committee and that would only be $40 apiece, and that Mr. Harvey replied, in effect, that "only three persons will see any part of this." Witness then asked Mr. Harvey how the money was paid, to whom, and under what conditions, and that Mr. Harvey replied that he wanted nothing further to do with it, but if definitely asked he would determine and advise whom to contact. Witness further testified that immediately after that conversation he and Mr. Harvey went to the Capitol Building; that they proceeded to the House chamber, and Mr. Harvey asked him to remain there a moment, that he wanted to see a man; that Mr. Harvey entered the House chamber and talked to a man whom the witness later identified as Mr. Ivanhoe; they were about twenty or thirty feet away; Mr. Harvey came back and gave him a business card of a law firm in St. Louis. The card was identified as containing the name of the law firm of Librach & Stolar, and witness related that Mr. Harvey said: "See the second name, the second man named on that business card, and he will handle all the details of the matter from now on." Witness then asked Mr. Harvey if he was to pay the $1000 to this man and Mr. Harvey replied: "I don't know, but he will advise you all the detail of procedure from thereon. In any event you will have to first pay him for his own retaining fee, which will be in addition to the One Thousand Dollars; how much that will be I don't know, but it will not be very much." During the examination of Mr. Harvey heretofore set out he denied making the statements testified to by Mr. Welsh.

The State also offered in rebuttal to the testimony of defendant that of two newspaper reporters, one of whom testified that on the day defendant appeared in Jefferson City in answer to the indictment he said, referring to Rodger, Blaze and Sparlin, that he had no dealings of any kind with any of those men; and that defendant further stated that he was in favor of the bill except one minor provision, and that he had worked for its passage. The other reporter testified that in a conversation with defendant he stated that he was in favor of the insurance agents' licensing bill except on some minor provisions. The foregoing is the substance of all the evidence, and the statement has been prolonged in deference to the contentions of counsel as to just what the testimony fails to show.

Counsel for appellant insist that the demurrer to the evidence should have been sustained for the reason that it was not shown that defendant intended to request any money as a bribe for himself or anyone else, and that measured by the strict requirements of criminal law the proof failed to show the elements of the charge against de-

fendant. It is argued that, giving full weight to the State's evidence, there was no testimony showing that the defendant solicited a bribe and that, even admitting the truth of the State's witnesses, statements attributed to defendant that it would cost $500 to get the bill of committee and $3500 to get it out of the House could be construed to mean that he was stating an estimate of legitimate expense necessary to obtain successful action on the bill, and that "where defendant's language may be given two interpretations, the criminal interpretation cannot be presumed." The nature of the statements thus attributed to the defendant is not in accord with the tesimony of the witnesses, which is set out *verbatim* and need not be repeated. That testimony, with other proof tending to show the activity and participation of others with whom defendant was in contact, and all the accompanying circumstances, supplied sufficient evidence for submission to the jury. The greater weight of the evidence is not for determination here, and the only function of this court in ruling the point made on the demurrer is to determine whether the State produced substantial evidence to sustain the charge made in the indictment. [State v. Scobee, 331 Mo. 217, 227, et seq., 53 S. W. (2d) 245.] It must be ruled that the State's evidence was substantially sufficient to support a finding of criminal intent and all elements of the charge made.

The chief effort of appellant is directed to an assault upon two of the instructions given by the court, over the objection and exception of defendant. They read as follows:

"S-1. The court instructs the jury that if you find and believe from the evidence, beyond a reasonable doubt, as reasonable doubt is defined in these instructions, that the defendant, Joseph L. Ivanhoe, was a duly elected qualified and acting member of the House of Representatives of the Sixty-first General Assembly of the State of Missouri, for the year 1941, and that at said session of said General Assembly the Bill introduced in evidence and referred to as House Bill No. 376, was introduced in the House of Representatives of said Sixty-first General Assembly by Howard Bruner, a member of the House of Representatives of the Sixty-first General Assembly, that said House Bill No. 376 was duly referred to the Committee on Insurance of the House of Representatives of the Sixty-first General Assembly, which said Committee having been appointed by virtue of the rules of said House of Representatives and in accordance with the laws and Constitution of the State of Missouri, and that said Joseph L. Ivanhoe was a member of said Committee on Insurance, and that it was the duty of the said Joseph L. Ivanhoe as a member of the Sixty-first General Assembly and a member of the Committee on Insurance of the House of Representatives to give said House Bill No. 376 his impartial consideration, judgment and decision as to whether said House Bill No. 376 should be passed by the House of Representatives of the

Sixty-first General Assembly, and if you further find and believe from the evidence beyond a reasonable doubt, that at the County of Cole in the State of Missouri, on or about the 8th day of May, 1941, the said Joseph L. Ivanhoe, being then a person before whom said House Bill No. 376 was pending in his official capacity, intending to betray his trust, and violate his duty as a member of the House of Representatives of the Sixty-first General Assembly of the State of Missouri, did then and there wilfully and unlawfully, wickedly and corruptly, and contrary to his duty as such member of the House of Representatives of the Sixty-first General Assembly, propose to and offer to receive as a bribe, gift, gratuity and reward, of and from John W. Rogers, Oliver Blase and Basil U. Sparlin, a large sum of money, to-wit: Three Thousand Five Hundred Dollars ($3500.00) to induce him the defendant, Joseph L. Ivanhoe, to corruptly cast his official vote in said House of Representatives in favor of said House Bill No. 376 and to secure the votes of members of the House of Representatives in favor of said House Bill No. 376, you will find the defendant guilty. And unless you so find you shall acquit the defendant. If you find the defendant guilty, you will assess his punishment at a fine not to exceed one hundred dollars ($100.00) or by imprisonment in the county jail for a term not to exceed two (2) months, or by both such fine and imprisonment.''

''S-2. The court instructs you that it was the official duty of Joseph L. Ivanhoe as a member of the House of Representatives of the State of Missouri in the past 61st General Assembly to give his impartial consideration, judgment and decision as to whether said House Bill No. 376 should be passed by the House of Representatives of the 61st General Assembly.''

Criticism is centered on Instruction S-2 as being erroneously prejudicial because argumentative, an abstract proposition of law, a roving commission, and a comment on the evidence. It is argued that the declaration of the court as to the duty of defendant is an independent instruction; that it was repeated in the principal instruction, and invited the jury to find defendant guilty as to any act of the defendant which the jury considered a failure to give impartial consideration, judgment and decision as to House Bill No. 376. A number of criminal cases are cited in which instructions were condemned as being comments on the evidence, or abstract propositions of law with no application to the facts of the case, or unwarranted references to matters outside the issues. Particlar reliance is placed on State v. Rozell, 225 S. W. 931; State v. Welch, 278 S. W. 755; State v. Farmer, 111 S. W. (2d) 76; State v. Fleetwood, 143 Mo. App. 698, 127 S. W. 934; and State v. Brown, 193 S. W. 902. Civil cases are also cited on the subject and to the same effect.

The mandate of the penal code, Section 4083, Revised Statutes Missouri 1939, is appropriate here. It reads as follows:

"The court shall not, on the trial of the issue in any criminal case, sum up or comment upon the evidence, or charge the jury as to matter of fact, unless requested to so do by the prosecuting attorney and the defendant or his counsel; but the court may instruct the jury in writing on any point of law arising in the cause."

Instruction S-2 may be said to fall under the ban of the foregoing section. It is a charge as to a matter of fact and is not an instruction on any point of law arising in the case. The duty of defendant as a member of the House of Representatives was not at all a necessary issue in the case, particularly so in reference to the exercise of his impartial consideration, judgment and decision as to whether said House Bill No. 376 should be passed. When brought under jury discussion as it presumably was, the instruction might have carried potential harm for defendant in view of the evidence that defendant never called the sub-committee together, never considered a vote, and would do nothing to promote the bill because he was opposed to it. The examination was carried beyond the time of the alleged offense with an inquiry as to why defendant did not bring his committee together and act upon the bill for the remaining two months of the legislative session. In view of defendant's admitted and known attitude toward the bill this instruction might well have had some prejudicial influence upon the jury, but his failure to give impartial consideration, judgment and decision upon the bill in question was not the crime charged and for which defendant was on trial. The sole issue for the jury to determine was whether defendant was guilty of soliciting a bribe as charged. Such an instruction formerly may have been justified on the ground that it was merely a declaration of the legal effect of facts in proof, but the tendency of controlling authority in our State has been to draw still tighter the restrictions against erroneous instructions in criminal cases. The following pronouncement is found in a very recent case, State v. Talbert, 174 S. W. (2d) l. c. 145:

"We have moved away from our holdings that an instruction as to the legal effect of certain kinds of evidence is proper and is not to be condemned as an unauthorized comment on the evidence, especially with respect to extra judicial statements by an accused, since State v. Hayes (Mo.), 262 S. W. 1034, 1036."

Instruction S-2 had no proper place in the case and no satisfactory justification of it has been presented by the State, nor has there been any showing made that would remove the possibility of harm occasioned by this error. As forcefully and well said long ago in reference to errors of the prosecution: "Error is presumptively harmful and it devolves upon the party who commits it to show that it could not possibly have resulted in injury. Especially is this true where the life or liberty of the citizen is at stake." [State v. Shipley, 174 Mo. 512, 516.] To the same effect, State v. Saunders, 288 Mo. 640, 655, 232

S. W. 973, 977. The error in the instructions complained of here, and discussed in part above, cannot be by-passed in the manner sought by the State in urging that a general legal proposition preliminary to another instruction is not erroneous, and that part of Instruction S-1, which required a finding of defendant's official duty as defined in Instruction S-2, merely placed an additional burden on the State and was favorable to appellant. Such suggestions lack force in the situation of this case. Instruction S-2 is not in a proper sense preliminary to any other instruction, nor does it pertain to any point of law arising in the case. It is more likely that the State sought an advantage by such instruction or it would not have been requested. It appears that a reviewing court must be constrained to rule in the situation found here that Instruction S-2 is reversibly erroneous.

The final assignment, and point urged by appellant, is that "the indictment states no offense punishable under the laws of the State of Missouri, for a charge of this nature must be one of perjury as required by Section 15, Article IV of the Missouri Constitution." It is argued that any member of the Legislature who violates his oath of office as prescribed in said section is guilty of perjury; that the solicitation of a bribe is a violation of that oath; that the only permissible indictment would be one for perjury, and that said constitutional provision has supplanted the common law and rendered defendant immune from an indictment for the commission of a misdemeanor in the solicitation of a bribe under the common law. No authority is cited to sustain this novel contention. It is said that the point as raised never has been ruled in this State. There is no merit in this assignment. The common law of England is the law of Missouri unless repugnant to or inconsistent with the Constitution of the United States, the Constitution of the State, or statute laws. [Sec. 645, R. S. Mo. 1939.] Solicitation of a bribe is a misdemeanor under the common law in force in this State. It has been so ruled by this court upon thorough consideration in the case of State v. Sullivan, 110 Mo. App. 75, 84 S. W. 105; and also by the St. Louis Court of Appeals in the case of State v. Farris, 229 S. W. 1100. The legal validity of the opinions in those cases does not appear ever to have been questioned. They are entitled to approval and adherence. The common-law rule that the solicitation of a bribe is an offense is not repugnant to or inconsistent with the Constitution or laws of Missouri.

The judgment should be reversed and the cause remanded for the error indicated. The Commissioner so recommends. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of BOYER, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded. *Bland* and *Cave, JJ.,* concur; *Shain, P. J.,* not sitting.